# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| THE STATE OF DELAWARE | ) | |
| | ) | |
| Plaintiff, | ) | |
| *ex rel.* | ) | |
| | ) | |
| WILLIAM SEAN FRENCH | ) | |
| Plaintiff-Relator, | ) | C.A. No. N13C-06-289 PRW CCLD |
| | ) | |
| v. | ) | |
| | ) | |
| CARD COMPLIANT, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

Submitted: January 24, 2017
Decided: April 21, 2017

## MEMORANDUM OPINION AND ORDER

*Upon Defendants, Ralph Lauren Corp., Ruth's Hospitality Group, Inc., and Shell Oil Co.'s Motions to Dismiss or, in the Alternative, for Summary Judgment,*
**GRANTED**.

Thomas E. Brown, Esquire, Edward K. Black, Esquire (argued), Stephen G. McDonald, Esquire, Deputy Attorneys General, Delaware Department of Justice, Wilmington, DE, Attorneys for the State of Delaware.

Stuart M. Grant, Esquire, Mary S. Thomas, Esquire (argued), Diane Zilka, Esquire, Vivian Upadhya, Esquire, Grant & Eisenhoffer P.A., Wilmington, DE, Attorneys for Plaintiff-Relator William Sean French.

Kenneth K. Nachbar, Esquire, Michael Houghton, Esquire, Matthew R. Clark, Esquire, Barnaby Grzaslewicz, Esquire, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE, Ethan D. Millar, Esquire, Of Counsel (*pro hac vice*), J. Andrew Howard, Esquire, Of Counsel (*pro hac vice*), Alston & Bird LLP, Los Angeles, CA, William R. Mitchelson, Jr., Esquire, Of Counsel (argued) (*pro hac vice*), Jason D. Popp, Esquire, Of Counsel (*pro hac vice*), Alston & Bird LLP, Atlanta, GA,

Attorneys for Defendants Ralph Lauren Corporation and Ruth's Hospitality Group, Inc.

Colm F. Connolly, Esquire, Jody C. Barillare, Esquire, Morgan, Lewis & Bockius LLP, Wilmington, DE, Gregory T. Parks, Esquire, Of Counsel (*pro hac vice*), Ezra D. Church, Esquire, Of Counsel (*pro hac vice*) (argued), Morgan, Lewis & Bockius, Philadelphia, PA, Attorneys for Defendant Shell Oil Company.

**WALLACE, J.**

## I.    INTRODUCTION

The State of Delaware and a foreign private citizen charge that dozens of Delaware's corporate citizens collectively attempted to cheat Delaware out of its portion of unused gift card balances via use of out-of-state "shell" entities devised to hold these funds.    Plaintiff-Relator William Sean French ("French") first brought this action in June 2013 pursuant to Delaware's False Claims and Reporting Act, alleging violations of Delaware's Abandoned and Unclaimed Property Law.[1]  The State of Delaware (for ease of reference referred to hereinafter as "the State," both individually and collectively with French) filed a Motion to Intervene on March 26, 2014.[2]

Before the Court are three Defendants' – Ralph Lauren Corporation ("Ralph Lauren"), Ruth's Hospitality Group, Inc. ("Ruth's"), and Shell Oil Company ("Shell") – Motions to Dismiss, or in the Alternative, for Summary Judgment. They allege this Court has no subject matter jurisdiction over the State's claims because its (adopted) Complaint is precluded by 6 *Del. C.* § 1206(b), the DFCRA's

---

[1]    *See* Pls.' Compl. ¶ 1, *State ex rel. French v. Card Compliant LLC*, C.A. No. N13C-06-289 PRW CCLD (Del. Super. Ct. June 28, 2013) (D.I. 1); DEL. CODE ANN. tit. 6, §§ 1201–1211 (2012) (Delaware False Claims and Reporting Act) [hereinafter "DFCRA"]; DEL. CODE ANN. tit. 12, §§ 1130–1190 (2012) (Delaware's Unclaimed Property Law) [hereinafter "DUPL"].

[2]    *See* Pls.' Compl. & St.'s Mot. to Intervene, *State ex rel. French v. Card Compliant LLC*, C.A. No. N13C-06-289 PRW CCLD (Del. Super. Ct. Mar. 26, 2014) (D.I. 1, 4).

-3-

Administrative Proceedings Bar.[3]  Even if subject matter jurisdiction exists, Defendants urge dismissal because, in their view, the State failed to adequately comply with its statutory obligation to investigate the factual allegations of its (adopted) Complaint.

Defendants argue that the State's case is precluded by the Administrative Proceedings Bar because its Complaint's claims are "substantially based upon allegations or transactions which are the subject of" the State's previous or current audits or inquiries of the Defendants.  The Court agrees.  Because the State's case is "substantially based upon transactions" that are, and have long been, the subject of ongoing State administrative proceedings, these three Defendants' motions to dismiss are **GRANTED**.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff-Relator William Sean French resides in Columbus, Ohio.  He claims to be an "original source" with personal knowledge of non-public facts central to the State's case.[4]  This means that he claims to have "direct and

---

3    DEL. CODE ANN. tit. 6, § 1206(b) (2012) ("In no event may a party bring an action under this chapter which is substantially based upon allegations or transactions which are the subject of a civil suit or an administrative proceeding in which the Government is already a party.") [hereinafter "Administrative Proceedings Bar"].  Because French's Complaint was filed on June 28, 2013, all parties agree this version of the Administrative Proceedings Bar, extant from June 30, 2000, to July 23, 2013, is applicable here.

4    Pls.' Compl. ¶ 12; DEL. CODE ANN. tit. 6, § 1206(c) (2012) ("For purposes of this subsection, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information

-4-

independent knowledge of the information on which the allegations are based."[5]

French claims to have, at some time, maintained the alleged out-of-state "shell" entities' books and records. He claims to have copies of the entities' marketing materials, contracts, and correspondence with the Defendants. This includes, most importantly here, reports of amounts of unredeemed gift card values.[6] But it appears that well prior to French's involvement, the State had already begun actions to investigate or audit Ralph Lauren, Ruth's, and Shell.

In June 2008, the State employed Kelmar Associates LLC ("Kelmar"), an auditing company with expertise in unclaimed property, to institute Audit proceedings against Shell to see if it was in compliance with Delaware's escheat laws.[7] This Audit was to include gift cards.[8] French was offered employment with Kelmar, the State's auditing company, more than three years later, on July 25,

---

to the Attorney General before filing an action under this chapter that is based on the information.").

[5] DEL. CODE ANN. tit. 6, § 1206(c) (2012).

[6] *See* Pls.' Compl. ¶ 12.

[7] Def. Shell Oil Co.'s Op. Br. in Support of Its Mot. to Dismiss for Lack of Subject Matter Jurisdiction or in the Alternative for Summ. J. at 3, Ex. 1 (Letter from Mark Udinski, Dir./St. Escheator, St. of Del. Dep't of Fin., to Peter R. Voser, Chief Fin. Officer, Royal Dutch Shell PLC (June 19, 2008)), *State ex rel. French v. Card Compliant, LLC, et al.*, C.A. No. N13C-06-289 PRW CCLD (Del. Super. Ct. Aug. 26, 2016) (D.I. 459) [hereinafter "Shell Br."].

[8] *Id.*

2011.[9] He began to work at Kelmar in August 2011 and was terminated less than three months later.[10]

On December 21, 2012, Ruth's submitted a notification of intent to enter into the Voluntary Disclosure Program with Delaware.[11] The State countersigned and accepted the notice of intent, admitting Ruth's to the Program on January 7, 2013.[12] This program included an investigation into all unredeemed gift card balances.[13] And so information relating to gift cards was provided by Ruth's to the State on March 28, 2013.[14]

---

[9] Letter from Matthew R. Clark, Esquire, Morris, Nichols, Arsht & Tunnel, to the Hon. Paul R. Wallace, Judge, Ex. A (Oct. 25, 2016) (Letter from Michael J. LeBlanc, Kelmar Assocs. LLC, to William Sean French (July 25, 2011) (offering French employment)).

[10] Def. Ralph Lauren Corp.'s Op. Br. in Support of Its Mot. to Dismiss or in the Alternative for Summ. J. at 3, Ex. 31 (Sean French termination dates), *State ex rel. French v. Card Compliant*, C.A. No. N13C-06-289 PRW CCLD (Del. Super. Ct. Aug. 25, 2016) (D.I. 454) [hereinafter "Ralph Lauren Br."].

[11] Def. Ruth's Hospitality Grp., Inc.'s Op. Br. in Support of Its Mot. to Dismiss or in the Alternative for Summ. J. at 8, *State ex rel. French v. Card Compliant, LLC, et al.*, C.A. No. N13C-06-289 PRW CCLD (Del. Super. Ct. Aug. 26, 2014) (D.I. 457) [hereinafter "Ruth's Br."]. *See generally* DEL. CODE ANN. tit. 12, § 1177 (2012) (providing the Secretary of State power to resolve and compromise claims for property owing to the State Escheator via a voluntary disclosure agreement); *How it Works*, DELAWARE.GOV: ABANDONED OR UNCLAIMED PROPERTY VDA PROGRAM, http://vda.delaware.gov/steps-to-vda/ (last visited Apr. 19, 2017).

[12] Ruth's Br. at 8 (citing Ruth's Ans. Ex. A.) (Disclosure & Notice of Intent to Voluntarily Comply with Abandoned Property Law Pursuant to 12 *Del. C.* § 1177 (Form VDA-1), Dec. 21, 2012 [hereinafter "Ruth's VDA"]).

[13] Ruth's Br. at 8.

[14] *Id.* at 9.

On February 6, 2013, the State notified Ralph Lauren that it was commencing an Audit to see if Ralph Lauren was in compliance with Delaware's escheat laws.[15] This Audit also included gift cards.[16]

On June 28, 2013, while the Audits and voluntary disclosure matters were ongoing, French filed his Complaint under seal. In it, he alleged that, among others, Ralph Lauren, Ruth's, and Shell employed various methods to avoid escheat obligations to the State. In his Complaint, French expressly stated that his *qui tam* action was not based on allegations or transactions that were the subject of an ongoing administrative proceeding.[17] The State intervened and his Complaint was unsealed on March 26, 2014.[18]

Prior to intervening, the State did not investigate whether or not any of the defendants in the *qui tam* action were undergoing administrative proceedings.[19]

---

[15]     Ralph Lauren Br. at 3.

[16]     *Id.*

[17]     Pls.' Compl. ¶ 9. *See also* Ralph Lauren Br. 1; Shell Br. 7; Ruth's Br. 1.

[18]     *See generally* Pls.' Compl.

[19]     Mot. Hr'g Tr. 25–27, Mar. 28, 2016 (The Court: "Mr. Black, the first question I have for you is why there was no disclosure by the State in its complaint or through an amended complaint that these proceedings had started much like it did in Pantry? When the State decided to intervene, it knew this information; right? It knew that the escheator had already sent the letters?" Mr. Black: "No." . . . The Court: "So one arm of the State didn't know what the other arm of the State was doing?" Mr. Black: "Correct." The Court: "You represent them; correct?" Mr. Black: "Yes, sir." The Court: "And you didn't know that they had started administrative proceedings against some of these very defendants?" Mr. Black: "Correct. . . . [The State] [s]imply intervened based on the information provided to us by the relator, which was pretty

The State is under a statutory obligation to investigate these claims prior to intervening and proceeding with a *qui tam* complaint.[20] The State admits it did not do so.[21] If it had, it would have learned that Ralph Lauren, Ruth's, and Shell were all undergoing administrative proceedings nearly identical to those Pantry, Inc. was subjected to, in which the Court previously found necessitated dismissal of that co-defendant in this very action.[22]

Ralph Lauren is a Delaware corporation with its principal place of business in New York City. Ruth's is a Delaware corporation with its principal place of business in Winter Park, Florida. And Shell is a Delaware corporation with its principal place of business in Houston, Texas.

---

compelling, and based on what we could find in the public record, which was likewise pretty compelling.").

[20] DEL. CODE ANN. tit. 6, § 1203(b)(2) (2012) ("Within 60 days after receiving a copy of the complaint, the Department of Justice shall conduct an investigation of the factual allegations and legal contentions made in the complaint. The Department of Justice may elect to intervene and proceed with the action within 60 days after it receives the complaint, the material evidence and information.").

[21] *See supra* note 19. The very same counsel for the State backed away from this admission later. *See* Mot. Hr'g Tr. at 40–45, Oct. 25, 2016. But not completely. *See id.* at 48–49 (Mr. Black: "And as I said, all we are talking about in terms of what we missed is one sentence in one paragraph in a three-hundred paragraph complaint."). And it is a fact of note that Kelmar, the very same firm conducting the audit work at issue here also provides litigation support to the Delaware Department of Justice's counsel. *See* Shell Br. at 9, Ex. 4 (Whitaker Dep. at 47–48, July 25, 2016). Troubling as this all may be, the Court need not resolve whether the State violated 6 *Del. C.* § 1203(b)(2), because grants the Defendants relief under 6 *Del. C.* § 1206(b).

[22] *See State ex rel. French v. Card Compliant, LLC*, 2015 WL 11051006, at *8–9 (Del. Super. Ct. Nov. 23, 2015).

Defendants have sold countless gift cards. These cards' holders use them to purchase Defendants' services or products. If a holder does not use the entire value of a card, the unused value remains available on the card for later use. According to the State, five years after the initial issuance of Defendants' gift cards, Delaware is entitled to any remaining balance on the gift card under the DAPL.[23]

The State alleges that Defendants intentionally failed to report and transfer the value of the unredeemed gift card balances to Delaware.[24] The State claims they did so by organizing, or contracting with co-defendants who organized, shell entities in Ohio and Florida to "hold" the value of unredeemed gift cards. Why? Because those states do not include unredeemed gift card values in their definitions of abandoned property.[25] The State claims Defendants created the relationships with various shell corporations in those states to issue the gift cards via contracts with two common central components: (1) a Card Services Agreement, and (2) a Trademark Licensing Agreement.[26] The Card Services Agreement states that a

---

[23]    *See* DEL. CODE ANN. tit. 12, §§ 1157, 1198(9)(a) (2012) ("All tangible personal property or intangible personal property . . . shall be presumed abandoned in this State if the last known address of the owner of the property is in this State and the property has remained unclaimed for 5 years.") ("'Period of dormancy' means the full and continuous period of 5 years . . . .").

[24]    Pls.' Compl. ¶ 4.

[25]    Pls.' Compl. ¶ 5.

[26]    Pls.' Compl. ¶ 6.

card servicer is responsible for manufacturing, marketing, and selling the gift cards, while the Defendants receive and hold money from the gift cards sold but not yet redeemed. The Trademark Licensing Agreement outlines payment between a card servicer and the Defendants. For the three Defendants here, the card servicer was co-defendant CardFact, Ltd. ("CardFact").

## A. DELAWARE AUDITS RALPH LAUREN

On February 6, 2013, the State Escheator contacted Ralph Lauren via letter. In the letter, he informed Ralph Lauren that Delaware was commencing an examination and audit of Ralph Lauren's books and records to see if it was complying with Delaware's escheat law.[27] This examination included gift certificates and gift cards.[28] The State's letter instructed Ralph Lauren to "issue a litigation hold notice so that all records, including, but not limited to . . . gift certificate issuances and redemptions, etc. will be retained. . . ."[29] The letter also noted that the audit would be conducted on the State's behalf by Kelmar.

---

[27] Ralph Lauren Br. at 3, Ex. 1 (Letter from Mark Udinski, Dir./St. Escheator, St. of Del. Dept. of Fin., to Christopher H. Peterson, Senior Vice Pres. & Chief Fin. Officer, Ralph Lauren Corp. (Feb. 6, 2013)).

[28] DEL. CODE ANN. tit. 12, § 1198(11) (2012) ("'Property' means personal property, including . . . gift certificates.").

[29] Ralph Lauren Br. at 4, Ex. 1 (Letter from Mark Udinski, Dir./St. Escheator, St. of Del. Dept. of Fin., to Christopher H. Peterson, Senior Vice Pres. & Chief Fin. Officer, Ralph Lauren Corp. (Feb. 6, 2013)).

On March 6, 2013, Kelmar demanded a number of documents from Ralph Lauren, including anything related to unclaimed property Voluntary Self-Disclosure Agreements ("VDAs") between Ralph Lauren and any state.[30] Kelmar regularly collects such information during an audit, as the terms of the VDA may impact the type and scope of review Kelmar undertakes. Ralph Lauren promptly informed Kelmar that they had completed a VDA with Delaware in 2002. Ralph Lauren made payments to Delaware pursuant to that VDA for unredeemed, abandoned gift certificates and merchandise credits between 2003 and 2006.[31] No payments were made in 2006. This is because on December 31, 2006, Ralph Lauren transferred all liabilities related to existing and prospective gift cards to CardFact pursuant to a Card Services Agreement.[32] Ralph Lauren suggested that

---

[30] Ralph Lauren Br. at 4, Ex. 3 (Letter from Lily Bradow, Kelmar Assocs. LLC, to Tara Donlin, Ralph Lauren Corp. (Mar. 6, 2013)).

[31] Ralph Lauren Br. at 5, Ex. 6 (Memorandum from Ethan Millar, Esquire, Alston & Bird, LLP, to Kelmar Assocs. LLC (July 19, 2013) ("The Company made a payment of $579,942.00 to Delaware in July 2002 in settlement of the VDA.")); Ex. 18 (Memorandum from Ethan Millar, Esquire, Alston & Bird, LLP, to Kelmar Assocs. LLC (Nov. 13, 2013) (providing additional information). The VDA released Ralph Lauren and its affiliates from any liability for any property identified through reporting year 2002 in exchange for (1) a $579,942 settlement payment, $450,450.71 of which was for gift certificates and merchandise certificates and (2) an agreement that Ralph Lauren would remit payments to the State for unredeemed gift certificate and merchandise credit property as it became abandoned and reportable to the extent that Ralph Lauren was the holder of the property as of the reporting date. *Id.* at Exs. 6 & 18.

[32] Ralph Lauren Br. at 6, Ex. 7 (Card Servs. Agmt. Between CardFact, Ltd. & Polo Ralph Lauren Corp. (Dec. 31, 2006)).

the gift cards issued by, or assigned to, CardFact under the Agreement should not be included in the audit.

On August 23, 2013, Kelmar sent an e-mail to Ralph Lauren with an agenda and binder of materials for an opening conference to be held on August 27, 2013.[33] The binder included a section entitled "Basic Abandoned and Unclaimed Property," stating that property subject to the escheat laws included "unredeemed gift certificates and store credits."[34] The property types discussed during that opening conference were the same property types listed in the agenda materials; this included gift cards.[35] So, gift cards are a focus of Delaware's Audit.

Delaware's Audit of Ralph Lauren is currently ongoing. There has been no resolution regarding any potential liability to Delaware for outstanding gift card balances.[36]

Back on March 26, 2014, Delaware intervened in the current action brought by French.[37] The State alleges that Ralph Lauren's Card Services Agreement with

[33]     Ralph Lauren Br. at 6, Ex. 9 (E-mail from Jason Freedman, Kelmar Assocs. LLC, to Ethan Millar, Esquire, Alston & Bird, LLP, Robert Alexander, Jonathan Shiffman & Michelle Meisenbach, Ralph Lauren Corp., Loredana Pfannenbecker, Sarah Massey & Matthew LeFurge, PricewaterhouseCoopers, LLP (Aug. 23, 2013)).

[34]     Ralph Lauren Br. at 7, Ex. 4 (Attachment Tab C to Letter from Mark Udinski, Dir./St. Escheator, St. of Del. Dept. of Fin., to Christopher H. Peterson, Senior Vice Pres. & Chief Fin. Officer, Ralph Lauren Corp. (Feb. 6, 2013)).

[35]     Ralph Lauren Br. at 7, Ex. 12 (Freedman Dep. at 90–91, July 29, 2013).

[36]     Ralph Lauren Br. at 7, Ex. 12 (Freedman Dep. at 97).

CardFact is an artifice through which the parties intended "to hide . . . revenue from the State by creating sham contracts portraying themselves as the 'holders' of unredeemed gift cards in exchange for an annual fee from the [Defendants]."[38] Upon intervening, the State ordered Kelmar to suspend the Audit as to gift cards.[39] This Motion to Dismiss followed on August 25, 2016.

## B. RUTH'S VOLUNTARY DISCLOSURE AGREEMENT

On December 26, 2005, Ruth's entered into a Card Services Agreement with CardFact.[40] The Agreement named CardFact "the holder of any unclaimed property with respect to any now existing Cards or Cards issued [after 2001]."[41]

In 2009, Louisiana conducted an unclaimed property audit of Ruth's. It intended to resolve unclaimed property issues associated with "(1) any unredeemed gift cards with no known customer address issued by any [Ruth's] Company that was incorporated in Louisiana and (2) any unredeemed gift cards issued to

---

[37] St.'s Mot. to Intervene.

[38] Pls.' Compl. ¶ 5.

[39] Mot. Hr'g Tr. at 37–39, Oct. 25, 2016. *See also* Ralph Lauren Br. at 10, Ex. 21 (E-mail from Aurianna Lopatka, Managing Director, Kelmar Assocs. LLC, to various Kelmar Employees (May 27, 2014) ("Delaware has instructed us to take no further action on any [gift card] component. . . .").

[40] Ruth's Br. at 4, Ex. C (Card Servs. Agmt. Between CardFact, Ltd. & Ruth's Chris Steak House (Dec. 26, 2005) [hereinafter "Ruth's CardFact Agmt."]).

[41] Ruth's Br. at 5, Ex. C. (Ruth's CardFact Agmt.).

customers located in Louisiana."[42] Ruth's disclosed the December 2005 CardFact agreement to Louisiana. Louisiana did not require Ruth's to report or remit any unclaimed property to Louisiana from the time period after entering into the CardFact agreement, but did require it to report anything prior to that.

The Louisiana audit ended in a Uniform Release Agreement between Louisiana and Ruth's, whereby Ruth's reported and remitted all qualifying property from before 2001 to Louisiana. Louisiana then released Ruth's from any further liability.[43]

In November 2010, Ruth's retained PricewaterhouseCoopers, LLC ("PwC") to assess any potential outstanding unclaimed property obligations in other states.[44] At PwC's advice, Ruth's entered into the Delaware Voluntary Disclosure Agreement ("VDA") program on December 21, 2012.[45] Under 12 *Del. C.* § 1177, this VDA program authorizes Delaware "to resolve and compromise claims for abandoned property otherwise owing to the State Escheator."[46]

---

[42] Ruth's Br. at 5–6 (Popal Aff. ¶ 5, Aug. 26, 2016).

[43] Ruth's Br. at 7, Ex. 4 (Uniform Release Agmt. Between the St. of La. and Ruth's Hospitality Grp., Dec. 31, 2012).

[44] Ruth's Br. at 5 (Popal Aff. ¶ 4, Aug. 26, 2016).

[45] Ruth's Br. at 7–8 (Popal Aff. ¶ 5, Aug. 26, 2016); Ruth's Br. at 7–8 (Ruth's Ans. Ex. A (Ruth's VDA)).

[46] DEL. CODE ANN. tit. 12, § 1177(a) (2012).

-14-

On January 7, 2013, Delaware authorized the required documentation allowing Ruth's entry into the VDA program.[47] The document reflected Delaware's intent to examine Ruth's books and records to find "all abandoned property related to all transactions years beginning January 1, 1996 . . . to present."[48] Gift certificates and cards were expressly included.[49]

On March 28, 2013, Ruth's submitted a VDA memorandum to Delaware outlining its gift card program. The memorandum explained the CardFact Agreement and included a copy of the Agreement. It stated that there were no unredeemed gift cards sold by Ruth's that were escheatable to the State due to the Agreement.[50] The State agreed with this conclusion. On May 14, 2013, a VDA Administrator stated that the "analysis was sound" and "we agree that the gift card liability, if any, for gift cards 'sold' by [Ruth's] . . . *appears to rest with CardFact or its successor in interest. . .* , not [Ruth's]."[51]

---

[47]     Ruth's Br. at 8 (Ruth's Ans. Ex. A (Ruth's VDA)).

[48]     Ruth's Br. at 8 (Ruth's Ans. Ex. A (Ruth's VDA)).

[49]     Ruth's Br. at 8–9, (Ruth's Ans. Ex. A (Ruth's VDA)); Ex. 5 (Introductory Meeting Requests from Del. Sec. of St. VDA Program); Popal Aff. ¶ 9, Aug. 26, 2016 ("[Ruth's] and its affiliates included gift cards within in the scope of Delaware's voluntary disclosure program.")).

[50]     Ruth's Br. at 9–10, Ex. 3 (Memorandum from Ethan Millar, Esquire, Alston & Bird, LLP, to Geoffrey Sawyer, Esquire, Drinker, Biddle & Reath, LLP (Mar. 27, 2013)).

[51]     Ruth's Br. at 10 (citing Ruth's Ans. Ex. D) (E-mail from Geoffrey Sawyer, Esquire, Drinker, Biddle & Reath, LLP, to Ethan Millar, Esquire, Alston & Bird, LLP (May 14, 2013) (emphasis added)).

-15-

On March 28, 2014, the State intervened in the instant action. The State alleges that Ruth's knowingly avoided escheat obligations related to gift cards and that the CardFact agreement is a "sham."[52] After intervening, the State directed its examiners to take no further action in any audits involving the Defendants.[53] The State believed that the same applied to any VDA proceedings.[54]

Yet one month after the State intervened here, its VDA administrators requested additional information regarding the CardFact Agreement and structure along with Ruth's gift card program. They claimed it was to expedite the VDA process for Ruth's. Ruth's provided the requested information to the State. Yet there has been no resolution regarding Ruth's potential liability for gift card balances under the VDA. Ruth's has neither withdrawn from the VDA program nor obtained a release from the State for any unclaimed property included in the VDA.[55] The VDA proceedings are suspended during the pendency of the instant litigation.[56]

---

[52] Pls.' Compl. ¶ 5.

[53] Mot. Hr'g Tr. at 37–39, Oct. 25, 2016.

[54] Whitaker Dep. at 97, July 25, 2017 (testifying as the State's designated witness that she believed VDAs were included in this suspension).

[55] Ruth's Br. at 13–14 (Popal Aff. ¶ 11, Aug. 26, 2016).

[56] Ruth's Br. at 11, Ex. 7 (E-mail from Aurianna Lopatka, Managing Director, Kelmar Assocs. LLC, to various Kelmar employees (May 27, 2014) (suspending any gift card activity)); Ex. 8 (Whitaker Dep. at 97).

## C. Delaware Audits Shell

In June 2008, the State began an Audit of Shell to determine if it was in compliance with Delaware's escheat laws and to see if it was the holder of any unclaimed property.[57] The Audit was to "relate to all property subject to escheat," including gift cards and gift certificates.[58] Kelmar conducted the Audit on Delaware's behalf, just as it did with Ralph Lauren.[59]

On September 16, 2011, Delaware began requesting specific documents and information related to Shell's gift card program and its work with CardFact.[60] Shell identified CardFact as the operator of its gift card program and provided Kelmar with its Card Services Agreement.[61]

---

[57] Shell Br. at 3, Ex. 1 (Letter from Mark Udinski, Dir./St. Escheator, St. of Del. Dep't of Fin., to Peter R. Voser, Chief Fin. Officer, Royal Dutch Shell PLC (June 19, 2008), Ex. 3 (Hibbard Dep. at 26, July 27, 2016).

[58] Shell Br. at 3, Ex. 1 (Letter from Mark Udinski, Dir./St. Escheator, St. of Del. Dep't of Fin., to Peter R. Voser, Chief Fin. Officer, Royal Dutch Shell PLC (June 19, 2008) ("The examination will relate to all property subject to escheat pursuant to Subchapter IV, Title 12, Delaware Code.")); Ex. 2 (Letter from Mark Udinski, Dir./St. Escheator, St. of Del. Dep't of Fin., to R.J. Braud, Vice President Fin. & Controller, Shell Oil Co. 1 (Sept. 16, 2008) (same)); Ex. 3 (Hibbard Dep. at 56–57).

[59] Shell Br. at 3–4, Ex. 1 (Letter from Mark Udinski, Dir./St. Escheator, St. of Del. Dep't of Fin., to Peter R. Voser, Chief Fin. Officer, Royal Dutch Shell PLC (June 19, 2008) ("The review will be conducted by Kelmar Associates on behalf of the State of Delaware . . . ."); Ex. 2 (Letter from Mark Udinski, Director/State Escheator, St. of Del. Dep't of Finance, to R.J. Braud, Vice President Fin. & Controller, Shell Oil Co. 1 (Sept. 16, 2008) (same)).

[60] Shell Br. at 4, Ex. 3 (Hibbard Dep. at 70–71); Ex. 5 (Nolte Dep. at 39–40, July 21, 2016).

[61] Shell Br. at 4–5, Ex. 7 (Letter from Anthony Nolte, Controller, Shell Oil Co., to Shawn Hibbard, Kelmar Assocs. (Nov. 30, 2011)); Ex. 3 (Hibbard Dep. at 78–80).

Mid-2012, Kelmar inquired as to whether Shell entered into any agreements that "transferred any gift card revenue, expense, asset, or liability to any other related or unrelated entity" and how gift card related entries appeared in Shell's books.[62] Shell informed Kelmar that all of that information was contained in the CardFact Agreement that it already provided. In March 2013, Shell identified for the State that CardFact was the "Card Owner/Issuer" and again explained the structure of its CardFact Agreement.[63] Shell also provided the number and value of gift cards activated and data for those gift cards with remaining balances.[64]

In November 2013, Kelmar requested detailed transactional level data from Shell. Shell told Kelmar that it could not provide that data because it did not maintain such records.[65] But it said that CardFact would have all such records

---

[62] Shell Br. at 5, Ex. 8 (Letter from Anthony Nolte, Controller, Shell Oil Co., to Shawn Hibbard, Kelmar Assocs. LLC 3 (May 18, 2012) ("Indicate whether any agreements have been entered into which results in the transfer of any gift certificate/card revenue, expense, asset, or liability to any other related or unrelated entity, and if so, provide any such agreement.")).

[63] Shell Br. at 5, Ex. 9 (Letter from Anthony Nolte, Controller, Shell Oil. Co., to Kevin Bruno, Kelmar Assocs. LLC (Mar. 31, 2013)).

[64] Shell Br. at 6, Ex. 9 (Letter from Anthony Nolte, Controller, Shell Oil. Co., to Kevin Bruno, Kelmar Assocs. LLC 4-5 (Mar. 31, 2013)); Ex. 3 (Hibbard Dep. at 94–101).

[65] Shell Br. at 6, Ex. 10 (Letter from Anthony Nolte, Controller, Shell Oil Co., to Shawn Hibbard, Kelmar Assocs. LLC (Nov. 8, 2013)); Ex. 3 (Hibbard Dep. at 103–106).

because it was the "sole obligor of all gift cards that were either sold or had a last activity date after January 1, 2002."[66]

While the Delaware Audit was ongoing, French filed his Complaint, and Delaware intervened. On June 2, 2014, Kelmar informed Shell that the State instructed it to suspend the gift card portion of the Delaware Audit during the pendency of this litigation.[67] Regardless of the suspension, Shell is still required to retain all records pertaining to gift cards.[68]

## III. STANDARD OF REVIEW[69]

Pursuant to Delaware Superior Court Civil Rule 12(b)(1), the Court must dismiss an action for lack of subject matter jurisdiction if it appears from the record that the Court does not have jurisdiction over the claims.[70] "The burden of establishing the Court's subject matter jurisdiction rests with the party seeking the

---

[66]    Shell Br. at 6, Ex. 10 (Letter from Anthony Nolte, Controller, Shell Oil Co., to Shawn Hibbard, Kelmar Assocs. 2 (Nov. 8, 2013)); Ex. 3 (Hibbard Dep. at 106).

[67]    Shell Br. at 8, Ex. 12 (E-mail from Shawn Hibbard, Kelmar Assocs., to Anthony Nolte, Controller, Shell Oil Co. (June 2, 2014) ("Delaware has instructed Kelmar not to proceed with the gift card portion of the examination at this time.")).

[68]    Shell Br. at 9, Ex. 3 (Hibbard Dep. at 61).

[69]    Because the Court resolves this motion under Del. Super. Ct. Civ. R. 12, the Court need not recite the standard of review for summary judgment under Rule 56(c).

[70]    Del. Super. Ct. Civ. R. 12(b)(1); Del. Super. Ct. Civ. R. 12(h)(3); *Airbase Carpet Mart, Inc. v. AYA Assocs., Inc.*, 2015 WL 9032894, at *2 (Del. Super. Ct. Dec. 15, 2015, *aff'd* 2016 WL 4938890 (Del. Sept. 16, 2016).

Court's intervention."[71] "When reviewing a claim for lack of subject matter jurisdiction, the Court 'need not accept Plaintiff's factual allegations as true and is free to consider facts not alleged in the complaint.'"[72]

## IV. DISCUSSION

Defendants argue that the DFCRA's Administrative Proceedings Bar precludes the Court from exercising subject matter jurisdiction over the State's claims here. The State argues that its claims are not barred under the Administrative Proceedings Bar because the Defendants have not been the subject of any prior or ongoing "administrative proceeding."

Defendants are correct; the Court does not have subject matter jurisdiction over the State's claims in this action due to the Administrative Proceedings Bar.

### A. DFCRA's ADMINISTRATIVE PROCEEDINGS BAR

The Superior Court has jurisdiction over all violations of the DFRCA.[73] However, DFCRA § 1206(b) states that "[i]n no event may a party bring an action under this chapter which is substantially based upon allegations or transactions

---

[71]  *Ropp v. King*, 2007 WL 2198771, at *2 (Del. Ch. July 25, 2007).

[72]  *Ramunno & Ramunno, P.A. v. Potter*, 2016 WL 2982367, at *2 (Del. Super. Ct. May 11, 2016) (citing *Appriva Shareholder Litigation Co., LLC v. EV3, Inc.*, 937 A.2d 1275, 1285 n.14 (Del. 2007)).

[73]  DEL. CODE ANN. tit. 6 § 1201(c) (2012).

-20-

which are the subject of a civil suit or an administrative proceeding in which the Government is already a party."[74]

So Section 1206(b) carves from the Court's jurisdiction any action brought by any party if it is substantially based on allegations or transactions that are the subject of an administrative proceeding in which the State is already a party. Where "the Court lacks jurisdiction of the subject matter, the Court shall dismiss the action."[75] In turn, this subject matter jurisdiction issue is a threshold one that must be determined before the case against these three Defendants may proceed further.[76]

At issue here are DFCRA § 1206(b)'s two requirements for its application to bar litigation: first, whether there are prior or ongoing administrative proceedings against the Defendants in which the State was a party; and, second, whether the

---

[74] DEL. CODE ANN. tit. 6, § 1206(b) (2012). Again, § 1206(b) has been amended since this suit was first filed. *See* 79 Del. Laws ch. 141, § 1 (2013) (codified at 6 *Del. C.* § 1206 (2013)). But as this was the wording of the Administrative Proceedings Bar extant from June 30, 2000 to July 23, 2013, all parties agree it is this version that applies in this case.

[75] Super. Ct. Civ. R. 12(h)(3).

[76] Indeed, Section 1206(b) is jurisdictional. *See, e.g.*, *Costner v. URS Consultants, Inc.*, 153 F.3d 667, 675–76 (8th Cir. 1998) (discussing analogue administrative proceedings bar in the Federal False Claims Act and describing it as a "jurisdictional bar"); *United States ex rel. S. Prawer & Co v. Fleet Bank of Maine*, 24 F.3d 320, 326–29 (1st Cir. 1994) (resolving "the jurisdictional question" raised by invocation of the Federal False Claims Act's administrative proceedings bar); *Total Asset Recovery Servs., LLC v. Metlife*, 2013 WL 4586450, at *1 n.1 (Fla. Cir. Ct. Aug. 20, 2013) (noting that the administrative proceedings bar in Florida's False Claims Act "is jurisdictional"). *See also Sierra Club v. Del. Dep't of Nat. Res.& Envtl. Control*, 2015 WL 1548851, at *6 (Del. Super. Ct. Mar. 31, 2015), *aff'd* 2015 WL 6747438 (Del. Nov. 5, 2015) ("The question of subject matter jurisdiction is a threshold question.").

DFCRA claims are substantially based upon transactions or allegations that are or were the subject of the prior or ongoing administrative proceedings. Accordingly, for the bar to apply here, this Court must find: (1) that the Audits and the VDA are administrative proceedings; and, (2) that the subject matter of the Audits and the VDA are the same as the instant litigation. The Court has been here before in this case.

## B. APPLICATION OF THE ADMINISTRATIVE PROCEEDING BAR TO PANTRY, INC.'S DISMISSAL AND PRIOR AUDIT ACTIONS

In 2015, when a different judge was assigned, this Court applied 6 *Del. C.* § 1206(b) and dismissed Pantry, Inc. from this suit.[77] Pantry, Inc. had moved to dismiss, arguing Delaware's Audit of it to determine escheatable property was an administrative proceeding. Delaware audited Pantry, Inc. and determined that defendant's obligations prior to May 2011.[78] The State responded, arguing "that there was no administrative proceeding because the parties never ended-up in the Court of Chancery," and "even if there was, § 1206(b) only bars the transactions Kelmar [on behalf of Delaware] examined during its audit."[79]

---

[77] *State ex rel. French v. Card Compliant, LLC*, 2015 WL 11051006, at *8–9 (Del. Super. Ct. Nov. 23, 2015).

[78] *Id.*

[79] *Id.*

The judge observed that § 1206(b) "bars not only 'transactions,' but also 'allegations' that were the subject of [Delaware's] [A]udit."[80] Because the Complaint and Delaware's Audit were substantially based upon the same allegations or transactions, he found that the questioned property — unredeemed gift card values — cannot be the subject of the State's suit here.[81]

The Court's analysis then must inform the Court's interpretation of the Administrative Proceedings Bar now.[82] This is because "[a] successor judge overruling a decision of a predecessor judge of the same Court is strongly disfavored."[83] "Such a situation is guided by the doctrine of the law of the case so

---

[80] *Id.*

[81] *Id.*

[82] And this is so even though Pantry, Inc.'s Audit had been completed. *Id.* The clear language of the 2012 Administrative Proceedings Bar provides that a civil action is barred by "an administrative proceeding in which the Government *is already* a party." DEL. CODE ANN. tit. 6, § 1206(b) (2012) (emphasis added). The use of the present tense phrasing "is already" without question connotes that the bar is triggered by *ongoing*, unresolved administrative proceedings in which Delaware is a party.

[83] *New Castle Cty. v. Pike Creek Rec. Servs., LLC*, 82 A.3d 731, 744 (Del. Ch. Dec. 30, 2013) (citing *Frank G.W. v. Carol M.W.*, 457 A.2d 715, 718 (Del. 1983) ("[W]e want to emphasize that we take a dim view of a successor judge in a single case overruling a decision of his predecessor.")). It is well-settled that once a decision is rendered by the same court that decision should stand. *May v. Bigmar, Inc.* 838 A.2d 285, n.8 (Del. Ch. 2003) ("The 'law of the case' doctrine requires that issues already decided by the same court should be adopted without relitigation, and once a matter has been addressed in a procedurally appropriate way by a court, it is generally held to be the law of that case and will not be disturbed by that court unless compelling reason to do so appears." (citation omitted) (internal quotation marks omitted)).

as to promote 'fundamental fairness and . . . judicial efficiency.'"[84] "This is to ensure that, especially where the case is taken on by a successor judge, the parties are not 'entrapped by varying philosophies of different judges of the same Court in the case.'"[85] Yet unlike *res judicata*, the "law of the case doctrine is not inflexible . . . it is not an *absolute* bar to reconsideration of a prior decision that is clearly wrong, produces an injustice or should be revisited because of changed circumstances."[86] But here there is nothing to suggest either a change in circumstances or that injustice would ensue by applying the prior law of the case. To the contrary, nothing has been suggested by the State that convinces the Court it should abandon the general law-of-the-case principle: it should be applied "in all instances except in those extraordinary circumstances where justice demands revisiting the merits of the parties' claims."[87] The Court finds no such extraordinary circumstances exist.

---

[84] *Pike Creek Rec. Servs., LLC*, 82 A.3d, at 744–45 (quoting *Zirn v. VLI Corp.*, 1994 WL 548938, at *2 (Del. Ch. Sept. 23, 1994)). This is especially true in Delaware where often more than one judge will preside over an individual case during its pendency. *Frank G.W.*, 457 A.2d at 719 ("Considerations of courtesy and comity are particularly relevant in Delaware where it is not unusual for our Superior Court to have various judges involved at different stages of protracted cases.").

[85] *Pike Creek Rec. Servs., LLC*, 82 A.3d, at 745 (quoting *Frank G.W.*, 457 A.2d at 719).

[86] *Gannett Co., Inc. v. Kanaga*, 750 A.2d 1174, 1181 (Del. 2000) (emphasis in original).

[87] *Pike Creek Rec. Servs., LLC*, 82 A.3d, at 745; *Frank G.W.*, 457 A.2d at 719 (noting exceptions to the general rule of restraint a successor judge follows in adhering to a prior ruling "should be entertained only in extraordinary circumstances").

## C. WHAT'S AN "ADMINISTRATIVE PROCEEDING" WITH THE STATE "ALREADY A PARTY" UNDER DELAWARE'S 2012 VERSION OF THE ADMINISTRATIVE PROCEEDINGS BAR?

The DFCRA does not define the term "administrative proceeding." So the Court must determine what was meant to bar DFCRA claims under § 1206(b). At issue here are two Delaware-directed Audits and one VDA.

### 1. Delaware's Abandoned or Unclaimed Property Audit Process

Twelve *Del. C.* § 1155 begins the Abandoned or Unclaimed Property Audit process by allowing the State to gather information from a person (or organization) who may be holding abandoned or unclaimed property "to determine whether the person [or organization] has complied with" the provisions of the DUPL.[88] Once this process is complete, the Audit Manager provides a Report with the Audit's findings.[89] If Delaware decides that the information gathered by the Audit Manager shows "that a holder has underreported abandoned or unclaimed property due and owing," the Auditor mails a statement of findings and requests payment from the holder.[90] After the holder receives the statement of findings and payment request, it has 60 days to file a protest.[91] The holder can submit additional

---

[88] DEL. CODE ANN. tit. 12, § 1155(a) (2012). This provision has since been amended and re-designated as 12 *Del. C.* § 1178. *See* 81 Del. Laws ch. 1, § 2 (2017) (codified at 12 *Del. C.* § 1178). The Court cites to those provisions in effect at the time this action was brought.

[89] Whitaker Aff. at ¶ 9, Sept. 22, 2016; Gizzi Aff. at ¶ 8, Sept. 22, 2016.

[90] DEL. CODE ANN. tit. 12, § 1156(a) (2010).

documentation if needed, but no later than 30 days after the protest.[92] The Audit Manager then makes a written determination on any protest within 60 days if no additional information is filed and within 90 days if additional information is filed.[93] If the holder is not satisfied with that determination, it may appeal to the Secretary of Finance, who will appoint an independent reviewer to the appeal of the Audit Manager's findings.[94] Either party may then appeal to the Court of Chancery.[95]

### 2. Delaware's Abandoned Property VDA Process

Twelve *Del. C.* § 1177 controls the Delaware Abandoned Property VDA process.[96] The statute allows the Secretary of State to "resolve and compromise claims for abandoned property otherwise owing to the State Escheator" via a voluntary disclosure agreement process.[97] When doing so, the Secretary has

---

[91]     *Id.* § 1156(b).

[92]     *Id.* § 1156(d).

[93]     *Id.* § 1156(e).

[94]     *Id.* § 1156(g).

[95]     *Id.* § 1156(j).

[96]     *Id.* § 1177. This provision has since been amended and redesignated as 12 *Del. C.* § 1173. *See* 81 Del. Laws ch. 1, § 2 (2017) (codified at 12 *Del. C.* § 1173). Again, this Court cites to those provisions in effect as the time this action was brought.

[97]     Del. Code Ann. tit. 12, § 1177 (2013).

"full and complete authority to determine and resolve all such claims."[98] And "any unclaimed property disclosure agreement accepted by the Secretary of State shall be deemed as waiving the right of [the State] to seek payment of any amounts of property pursuant to [the audit provisions]" unless there is fraud or willful misrepresentation by the party making the disclosure.[99] If the Secretary is unable to resolve the claims, he may refer the resolution to the State Escheator at any time.[100] Thus, once the party enters into a VDA with the State, it remains engaged in the process until a resolution is reached by either the Secretary of State or the State Escheator.

A holder of abandoned property, as a disclosing party, initiates Delaware's VDA process by filing with the Secretary of State a Disclosure and Notice of Intent to Voluntarily Comply with Delaware's Abandoned Property Law.[101] Within about 30 days, the State's VDA Administrator "returns a countersigned

---

[98]   *Id.* § 1177.

[99]   *Id.* § 1177(a).

[100]   *Id.*

[101]   *See How it Works*, DELAWARE.GOV: ABANDONED OR UNCLAIMED PROPERTY VDA PROGRAM, http://vda.delaware.gov/steps-to-vda/ (last visited Apr. 19, 2017).

[confidentiality and non-disclosure agreement]," follows-up the discloser's prior submissions, and "prompts [the discloser] on expectations for [the] next phase."[102]

Within 90 days of entering the initial document, the disclosing party self-reviews documents and must present those review findings to the VDA Administrator.[103] The disclosing party is obliged to perform "a detailed, transaction-level review of the available records" and "check-in with [the VDA] Administrator on the methods used and/or all assumptions made during this process."[104] The discloser must then present the VDA Administrator with a final report, which the VDA Administrator reviews and follows up as needed.[105] During this process, the State's VDA Administrator confirms and tests the disclosing party's conclusions. Delaware and the disclosing party then execute a final report and summary schedule and Delaware generates a demand letter to prompt the voluntary discloser to remit payment.[106] This discharges the disclosing party from all obligations arising from the years included in the VDA.

---

[102] *Id.*

[103] *Id.*

[104] *Id.*

[105] *Id.*

[106] *Id.*

### 3. Both the Delaware Audits and VDAs Defendants Have Endured Here are Administrative Proceedings Under the Then-Extant § 1206(b)

"When there is a dispute over the meaning or effect of a statutory provision, a Court conducts a search for legislative intent."[107] In seeking such intent, "Delaware courts utilize the plain meaning rule."[108] Because there is no specific definition of an "administrative proceeding" in the statute, the Court looks to ordinary sources to define the term.[109] Black's Law Dictionary says an "administrative proceeding" is "[a] hearing, inquiry, investigation, or trial before an administrative agency, usually adjudicatory in nature but sometimes quasi-legislative."[110]

For sure, each process at issue here – a § 1155 Audit and a § 1177 VDA – is an "inquiry" or "investigation" directed by an administrative agency of the State. Both have compulsory aspects. Both are invasive and time-consuming. And in both the State 'inquires' into and 'investigates' the target's books and records.

---

[107] *State v. Cephas*, 637 A.2d 20, 23 (Del. 1994) (internal citations omitted).

[108] *In re Adoption of Swanson*, 623 A.2d 1095, 1096–97 (Del. 1993).

[109] *See Cephas v. State*, 911 A.2d 799, 801 (Del. 2006) ("Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined [in a statute].") (internal citations and quotations omitted).

[110] *Black's Law Dictionary* (10th ed. 2014).

The federal analogue to the DFCRA is informative when deriving the proper definition of "administrative proceeding" under our statute.[111] Thirty-one U.S.C. § 3130(e)(3) states that "[i]n no event may a person bring an action under [the Federal False Claims Act] which is based upon allegations or transactions which are the subject of a civil suit or administrative civil money penalty proceeding in which the Government is already a party."[112] This language is nearly identical the DFCRA's.[113] The federal statute was enacted "to continue the prohibition against strictly parasitic lawsuits."[114] It was a "congressional effort[] to walk a fine line between encouraging whistle blowing and discouraging opportunistic behavior. . . . [The Court] must [reject] suits which the government is capable of pursing itself, while promoting those which the government is not equipped to bring on its own."[115]

---

[111] *State ex rel. French*, 2015 WL 11051006, at *6 ("Delaware authority interpreting the DFCRA is scant. Since the DFCRA is modeled after the federal False Claims Act, the court will look to federal case law for guidance.") (internal citations omitted). *See also State ex rel. Higgins v. SourceGas, LLC*, 2012 WL 1721783, at *4 (Del. Super. Ct. May 15, 2012); *State Dep't of Labor – Div. of Unemp't Ins. v. Pasquale*, 2015 WL 5461540, at *3 (Del. Super. Ct. Sept. 17, 2015).

[112] 31 U.S.C. § 3730(e)(3) (2010).

[113] *Compare id., with* DEL. CODE ANN. tit. 6, § 1206(b) (2009).

[114] *S. Prawer & Co.*, 24 F.3d, at 326.

[115] *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 651 (D.C. Cir. 1994).

Neither the federal nor the Delaware statutes expressly define what an "administrative proceeding" is, for the purposes of barring litigation. Nor is Delaware or federal law expressly helpful in doing so. But Florida has an administrative proceedings bar in its false claims statutory scheme that almost mirrors both the federal and Delaware laws.[116] There, a circuit court found that Florida's Department of Financial Services' institution of an audit to determine compliance with unclaimed property obligations constituted an administrative proceeding for purposes of barring *qui tam* litigation.[117]

Applying the holding of the prior judge in this matter, the federal courts' observations regarding the bases for the federal bar, and Florida's helpful guidance, the Court finds an "administrative proceeding" exists — for the purposes of the 2012 version of § 1206's Administrative Proceedings Bar — if there is an undertaking of a compulsory nature engaged by Delaware state agency actors to inquire about, investigate, and resolve a particular state law compliance issue.

---

[116]     *See* FLA. STAT. § 68.087(2) (2009) ("In no event may a person bring an action under § 68.083(2) [Florida's False Claims Act] based upon allegations or transactions that are the subject of a civil action or an administrative proceeding in which the state is already a party.").

[117]     *See Total Asset Recovery Servs., LLC v. Metlife, Inc.*, 2013 WL 4586450, at * 1 (Fla. Cir. Ct. Aug. 20, 2013) ("Because [the plaintiffs'] complaint is based entirely upon transactions and allegations that the State has already resolved in administrative proceedings [the audit] and does nothing to further [Florida's False Claims Act], this Court lacks jurisdiction . . . .").

**D. IS THIS SUIT "BASED UPON" SIMILAR "TRANSACTIONS" UNDER THE 2012 VERSION OF THE ADMINISTRATIVE PROCEEDINGS BAR?**

Six *Del. C.* § 1206(b) states that "[i]n no event may a party bring an action under [the DFCRA] which is substantially based upon allegations or transactions which are the subject of a civil suit or an administrative proceeding in which the Government is already a party."[118] Just as interpretation of the DFCRA's federal analogue informed the Court's understanding of the meaning of "administrative proceeding," federal law can aid the Court in interpreting the phrase "based upon" as it appears in § 1206(b). If the facts and circumstances (*i.e.*, transactions) giving rise to the instant suit are substantially based upon those subject to inquiry or investigation during an ongoing or completed administrative proceeding, then the suit cannot move forward. There is no doubt that the audit processes initiated by Kelmar at the request of the State, and the VDA initiated by Ruth's, involve transactions that are the same as those set forth in the Complaint.

Case law interpreting the federal statute is again helpful. The federal statute seeks to avoid "parasitic" lawsuits based upon "allegations or transactions which are the subject of" a government suit or civil administrative action already undertaken.[119] "[A] court should first look to whether the two cases can properly

---

[118]     DEL. CODE ANN. tit. 6, § 1206(b) (2009).

[119]     *S. Prawer & Co.,* 24 F.3d at 327 (citing *Quinn,* 14 F.3d at 651); 31 U.S.C. § 3730(e)(3) (2010).

be viewed as having the qualities of a host/parasite relationship . . . .[by asking] whether the *qui tam* action is receiving 'support, advantage, or the like' from the 'host' case (in which the government is a party) 'without giving any useful or proper return to the government. . . .'"[120] A *qui tam* action has the potential for "useful or proper return" to the government if "(1) it seeks recovery from the alleged defrauders of the government for fraud that has *not yet been the subject of a claim by the government*; and (2) it has the potential to restore money to the public fisc that *would not and could not have been restored [otherwise]*."[121]

At bottom, if the government has made the same claims or seeks the same relief in a separate proceeding, it may not be involved in a *qui tam* suit with the same underlying purpose. This suit and the administrative actions seek to recover escheatable property (money) that the State believes the Defendants may owe. This civil suit would not restore any money to Delaware that would not be restored via the proper completion of the ongoing Audits and VDA. And so, the Administrative Proceedings Bar applies here.

The Florida audit case again provides a helpful example of such an application. In that case, the plaintiff-relator brought claims for an alleged failure

---

[120]    *Id.* at 327–28 (internal citations omitted).

[121]    *Id.* at 329 (emphasis added).

to escheat death benefits under Florida's unclaimed property laws.[122] Prior to the lawsuit, Florida instituted an audit of the defendant to see if it did indeed fail to escheat life insurance proceeds. The Florida court found that the subject matter in the two actions were essentially identical because the transactions (or alleged lack of transactions with the state) were at issue.[123] So too here.

Lastly, the dictionary definition of "transactions" — "[s]omething performed or carried out; a business agreement or exchange" — supports a finding that this suit is "substantially based upon" the same matters that are the subject of Delaware's administrative actions.[124] Here, the gift card commerce controlled by the Agreements between the Defendants and CardFact are the subject of both the Audits/VDA and the instant litigation.

The bases of the Delaware Audits and VDA are potential escheatable property stemming from dormant gift card balances that Defendants supposedly owe Delaware. The basis of the instant litigation is the same — that is, dormant gift card balances. The State sought through administrative action to recover — by compulsion or by the target's agreement — that specific potentially escheatable property. The State through suit alleges that Defendants entered into the

---

[122]     *See Total Asset,* 2013 WL 4586450, at *1.

[123]     *Id.*

[124]     *Black's Law Dictionary* (10th ed. 2014).

-34-

Agreements with CardFact to prevent the dormant balances from escheating to Delaware and seeks recovery of those allegedly due balances, and a good deal more.[125] As such, this suit and the Audits and VDA are "substantially based upon" the same "allegations or transactions." A quick comparison of the specifics of each Defendant's circumstances makes this clear.

### 1. Ralph Lauren

In this civil suit, the State argues Ralph Lauren failed to escheat dormant gift card balances to Delaware. The State claims that "[b]ased on Relator's experience in the gift card industry and his knowledge of [Ralph Lauren's] gift card operations, Relator estimates that, in fact, [Ralph Lauren] presently holds $20 million to $30 million in unredeemed gift cards that are 'abandoned or unclaimed property'. . . ."[126] Documentation relating to this claim is exactly that previously demanded by Delaware for the Audit. The State demanded information on "all property subject to escheat," including anything related to Ralph Lauren's gift cards. The notification of Delaware's Audit required Ralph Lauren place a litigation hold on all books and records including "gift certificate issuances and

---

125    Pls.' Compl. ¶ 60 & Part VIII (Prayer for Relief).

126    Pls.' Compl. ¶ 127.

redemptions."[127] And the notification further required Ralph Lauren to "mak[e] necessary records available for past and present years for the purpose of determining [Ralph Lauren]'s compliance with Subchapter IV, Title 12, Delaware Code."[128] Delaware's Audit was initiated for the purpose of administratively determining compliance with the specific law that the State now, in this suit, alleges Ralph Lauren violated.

Due to the identical nature of the underlying subject matter, Ralph Lauren meets the requirements of the 2012 Administrative Procedures Bar.

### 2. Ruth's

The State alleges in this suit that Ruth's failed to escheat dormant gift card balances to Delaware. Prior to initiation of the suit, Ruth's entered into a VDA with Delaware to resolve any claims that Delaware may have had for unclaimed property owed to it. Ruth's says that the subject matter of the VDA with Delaware is the same as that of the instant suit. The Court agrees.

When Ruth's entered into the VDA with Delaware, both parties intended that Delaware would examine Ruth's books and records to identify "all abandoned property related to all transaction years beginning January 1, 1996 . . . to the

---

[127]    Ralph Lauren Br. at 4, Ex. 1 (Letter from Mark Udinski, Dir./St. Escheator, St. of Del. Dept. of Fin., to Christopher Peterson, Senior Vice Pres. & Chief Fin. Officer, Ralph Lauren Corp. (Feb. 6, 2013)).

[128]    *Id.*

present."[129] The VDA did not *exclude* any types of unclaimed property. In fact, the VDA expressly *included* gift cards as property types to be examined.[130]

Here, the State alleges that Ruth's "presently holds almost $50 million in unredeemed gift cards. Approximately $30 million of that amount is 'abandoned or unclaimed property' that [Ruth's] should have already reported and transferred to Delaware."[131] In the VDA, Ruth's disclosed "all abandoned property," including gift cards. Therefore, the State's case here and the before-filed VDA address identical transactions. The VDA here meets the requirement of the 2012 Administrative Procedures Bar.

### 3. Shell Oil Company

The State in this suit alleges Shell failed to escheat dormant gift card balances to Delaware. The State claims that "[b]ased on Relator's experience in the gift card industry and his knowledge of Shell's gift card operations, Relator estimates that, in fact, Shell presently holds $15 million in unredeemed gift cards that are 'abandoned or unclaimed property'. . . ."[132] Documentation relating to this claim is exactly what was requested for Delaware's Audit, including information

---

[129]   Ruth's Br. at 4 (Ruth's Ans. Ex. A (Ruth's VDA))

[130]   *Id.*

[131]   Pls.' Compl. ¶ 115.

[132]   Pls.' Compl. ¶ 141.

on "all property subject to escheat" and anything related to gift cards.[133] As part of that Audit process, Delaware requested specific information relating to the gift card program and Shell's Agreement with CardFact.[134]

Due to the identical nature of the underlying activity, Shell has met the requirements of the Administrative Procedures Bar.

## V. CONCLUSION

Accordingly, for the reasons stated above, this Court does not have subject matter jurisdiction over the action and Ralph Lauren's, Ruth's, and Shell's Motions to Dismiss are **GRANTED**.

**IT IS SO ORDERED.**

**Paul R. Wallace, Judge**

---

[133] Shell Br. at 3, Ex. 1 (Letter from Mark Udinski, Dir./St. Escheator, St. of Del. Dept. of Fin., to Peter Voser, Chief Fin. Officer, Royal Dutch Shell PLC 1 (June 19, 2008)); Ex. 2 (Letter from Mark Udinski, Asst. Dir. Abandoned Prop., St. of Del. Dept. of Fin., to R.J. Braud, Vice Pres. Fin. & Controller, Shell Oil Co. 1 (Sept. 16, 2008)).

[134] Shell Br. at 4, Ex. 3 (Hibbard Dep. at 70–71), Ex. 5 (Nolte Dep. at 39–40).